# United States Court of Appeals
## For the First Circuit

No. 15-1724

JANE DOE NO. 1 ET AL.,

Plaintiffs, Appellants,

v.

BACKPAGE.COM, LLC ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Barron, Circuit Judge,
Souter,* Associate Justice,
and Selya, Circuit Judge.

John T. Montgomery, with whom Ching-Lee Fukuda, Aaron M. Katz, Christine Ezzell Singer, Jessica L. Soto, Rebecca C. Ellis, and Ropes & Gray LLP were on brief, for appellants.
Maura Healey, Attorney General of Massachusetts, and Genevieve C. Nadeau, Deputy Chief, Civil Rights Division, on brief for Commonwealth of Massachusetts, amicus curiae.
Dennis J. Herrera, City Attorney, Victoria Wong, Mollie Lee, Elizabeth Pederson, and Mark D. Lipton, Deputy City Attorneys, on brief for City and County of San Francisco, amici curiae.
Cathy Hampton, City Attorney, on brief for City of Atlanta, amicus curiae.
Michael N. Feuer, City Attorney, James P. Clark, Mary Clare

---

* Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

Molidor, Anh Truong, Sahar Nayeri, and Office of the Los Angeles City Attorney, on brief for City of Los Angeles, California, amicus curiae.

Tracy Reeve, City Attorney, and Harry Auerbach, Chief Deputy City Attorney, on brief for City of Portland (Oregon), amicus curiae.

Donna L. Edmundson, City Attorney, on brief for City of Houston, amicus curiae.

Shelley R. Smith, City Solicitor, on brief for Michael A. Nutter, Mayor of Philadelphia, amicus curiae.

Jeffrey Dana, City Solicitor, on brief for City of Providence and Mayor Jorge O. Elorza, amicus curiae.

Stacey J. Rappaport and Milbank, Tweed, Hadley & McCloy LLP on brief for Covenant House, Demand Abolition, ECPAT-USA, Human Rights Project for Girls, My Life, My Choice of Justice Resource Institute, National Crime Victim Law Institute, Sanctuary for Families, and Shared Hope International, amici curiae.

Jenna A. Hudson, Kami E. Quinn, Gilbert LLP, and Andrea Powell, Executive Director, on brief for FAIR Girls, amicus curiae.

Michael Rogoff, Robert Barnes, Oscar Ramallo, and Kaye Scholer LLP, on brief for National Center for Missing and Exploited Children, amicus curiae.

Jeffrey J. Pyle, with whom Robert A. Bertsche, Prince Lobel Tye LLP, James C. Grant, Ambika K. Doran, and Davis Wright Tremaine LLP were on brief, for appellees.

---

March 14, 2016

---

**SELYA**, **Circuit Judge**. This is a hard case — hard not in the sense that the legal issues defy resolution, but hard in the sense that the law requires that we, like the court below, deny relief to plaintiffs whose circumstances evoke outrage. The result we must reach is rooted in positive law. Congress addressed the right to publish the speech of others in the Information Age when it enacted the Communications Decency Act of 1996 (CDA). See 47 U.S.C. § 230. Congress later addressed the need to guard against the evils of sex trafficking when it enacted the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), codified as relevant here at 18 U.S.C. §§ 1591, 1595. These laudable legislative efforts do not fit together seamlessly, and this case reflects the tension between them. Striking the balance in a way that we believe is consistent with both congressional intent and the teachings of precedent, we affirm the district court's order of dismissal. The tale follows.

## I. BACKGROUND

In reviewing the grant or denial of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), we draw upon the well-pleaded facts as they appear in the operative pleading (here, the second amended complaint). See SEC v. Tambone, 597 F.3d 436, 438 (1st Cir. 2010) (en banc).

Backpage.com provides online classified advertising, allowing users to post advertisements in a range of categories

based on the product or service being sold.[1]  Among the categories provided is one for "Adult Entertainment," which includes a subcategory labeled "Escorts."   The site is differentiated by geographic area, enabling users to target their advertisements and permitting potential customers to see local postings.

This suit involves advertisements posted in the "Escorts" section for three young women — all minors at the relevant times — who claim to have been victims of sex trafficking. Suing pseudonymously, the women allege that Backpage, with an eye to maximizing its profits, engaged in a course of conduct designed to facilitate sex traffickers' efforts to advertise their victims on the website.  This strategy, the appellants say, led to their victimization.

Past is prologue.  In 2010, a competing website (Craigslist) shuttered its adult advertising section due to concerns about sex trafficking.  Spying an opportunity, Backpage expanded its marketing footprint in the adult advertising arena. According to the appellants, the expansion had two aspects. First, Backpage engaged in a campaign to distract attention from its role in sex trafficking by, for example, meeting on various occasions with hierarchs of the National Center for Missing and Exploited

---

[1] The appellants sued Backpage.com, LLC, Camarillo Holdings, LLC, and New Times Media, LLC.  For ease in exposition, we refer to these three affiliated companies, collectively, as "Backpage."

Children (NCMEC) and making "false and misleading representations" to the NCMEC and law enforcement regarding its efforts to combat sex trafficking. But this campaign, the appellants suggest, was merely a ruse.

The second aspect of Backpage's expansion strategy involved the deliberate structuring of its website to facilitate sex trafficking. The appellants aver that Backpage selectively removed certain postings made in the "Escorts" section (such as postings made by victim support organizations and law enforcement "sting" advertisements) and tailored its posting requirements to make sex trafficking easier.[2]

In addition, the appellants allege that Backpage's rules and processes governing the content of advertisements are designed to encourage sex trafficking. For example, Backpage does not require phone number verification and permits the posting of phone numbers in alternative formats. There is likewise no e-mail verification, and Backpage provides users with the option to "hide" their e-mail addresses in postings, because Backpage provides

---

[2] The appellants note that (among other things) the process of posting an advertisement in the "Escorts" section does not require the poster to provide either identifying information or the subject of the advertisement. And even though the website does require that posters verify that they are 18 years of age or older to post in that section, entering an age below 18 on the first (or any successive) attempt does not block a poster from entering a different age on a subsequent attempt. Backpage also allows users to pay posting fees anonymously through prepaid credit cards or digital currencies.

message forwarding services and auto-replies on behalf of the advertiser. Photographs uploaded for use in advertisements are shorn of their metadata, thus removing from scrutiny information such as the date, time, and location the photograph was taken. While Backpage's automated filtering system screens out advertisements containing certain prohibited terms, such as "barely legal" and "high school," a failed attempt to enter one of these terms does not prevent the poster from substituting workarounds, such as "brly legal" or "high schl."

The appellants suggest that Backpage profits from having its thumb on the scale in two ways. First, advertisements in the "Adult Entertainment" section are the only ones for which Backpage charges a posting fee. Second, users may pay an additional fee for "Sponsored Ads," which appear on the right-hand side of every page of the "Escorts" section. A "Sponsored Ad" includes a smaller version of the image from the posted advertisement and information about the location and availability of the advertised individual.

Beginning at age 15, each of the appellants was trafficked through advertisements posted on Backpage. Jane Doe #1 was advertised on Backpage during two periods in 2012 and 2013. She estimates that, as a result, she was raped over 1,000 times. Jane Doe #2 was advertised on Backpage between 2010 and 2012. She estimates that, as a result, she was raped over 900 times. Jane Doe #3 was advertised on Backpage from December of 2013 until some

unspecified future date. As a result, she was raped on numerous occasions.[3] All of the rapes occurred either in Massachusetts or Rhode Island. Sometimes the sex traffickers posted the advertisements directly and sometimes they forced the victims to post the advertisements.

Typically, each posted advertisement included images of the particular appellant, usually taken by the traffickers (but advertisements for Doe #3 included some pictures that she herself had taken). Many of the advertisements embodied challenged practices such as anonymous payment for postings, coded terminology meant to refer to underage girls, and altered telephone numbers.

The appellants filed suit against Backpage in October of 2014. The operative pleading is the appellants' second amended complaint, which limns three sets of claims. The first set consists of claims that Backpage engaged in sex trafficking of minors as defined by the TVPRA and its Massachusetts counterpart, the Massachusetts Anti-Human Trafficking and Victim Protection Act of 2010 (MATA), Mass. Gen. Laws ch. 265, § 50(a). The second set consists of claims under a Massachusetts consumer protection

---

[3] Once the parents of Doe #3 located some of the Backpage advertisements featuring their daughter, they demanded that the advertisements be removed from the website. A week later (after at least one other entreaty to Backpage), the postings remained on the website.

statute, which forbids "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a). The last set consists of claims alleging abridgements of intellectual property rights.

In due season, Backpage moved to dismiss the second amended complaint for failure to state claims upon which relief could be granted. See Fed. R. Civ. P. 12(b)(6). Although the appellants vigorously opposed the motion, the district court dismissed the action in its entirety. See Doe ex rel. Roe v. Backpage.com, LLC, 104 F. Supp. 3d 149, 165 (D. Mass. 2015). This timely appeal ensued.

## II. ANALYSIS

The appellants, ably represented, have constructed a series of arguments. Those arguments are buttressed by a legion of amici (whose helpful briefs we appreciate). We review the district court's dismissal of the appellants' complaint for failure to state any actionable claim de novo, taking as true the well-pleaded facts and drawing all reasonable inferences in the appellants' favor. See Tambone, 597 F.3d at 441. In undertaking this canvass, we are not bound by the district court's ratiocination but may affirm the dismissal on any ground apparent from the record. See Santiago v. Puerto Rico, 655 F.3d 61, 72 (1st Cir. 2011). It is through this prism that we evaluate the appellants' asseverational array.

## A. **Trafficking Claims.**

The appellants challenge the district court's conclusion that section 230 of the CDA shields Backpage from liability for a course of conduct that allegedly amounts to participation in sex trafficking. We begin our consideration of this challenge with the text of section 230(c), which provides:

> (c) Protection for "Good Samaritan" blocking and screening of offensive material
>
> (1) Treatment of publisher or speaker
>
> No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.
>
> (2) Civil liability
>
> No provider or user of an interactive computer service shall be held liable on account of —
>
> > (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or
> >
> > (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in [subparagraph (A)].

47 U.S.C. § 230(c). Congress enacted this statute partially in response to court cases that held internet publishers liable for defamatory statements posted by third parties on message boards maintained by the publishers. See, e.g., Stratton Oakmont, Inc.

v. Prodigy Servs. Co., 1995 WL 323710, at *1, *5 (N.Y. Sup. Ct. May 24, 1995) (explaining that Prodigy was liable because, unlike some other website operators, it had taken steps to screen or edit content posted on its message board). Section 230(c) limits this sort of liability in two ways. Principally, it shields website operators from being "treated as the publisher or speaker" of material posted by users of the site, 47 U.S.C. § 230(c)(1), which means that "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions — such as deciding whether to publish, withdraw, postpone or alter content — are barred," Zeran v. Am. Online, Inc., 129 F.3d 327, 330 (4th Cir. 1997). Relatedly, it allows website operators to engage in blocking and screening of third-party content, free from liability for such good-faith efforts. See 47 U.S.C. § 230(c)(2)(A).

There has been near-universal agreement that section 230 should not be construed grudgingly. See, e.g., Doe v. MySpace, Inc., 528 F.3d 413, 418 (5th Cir. 2008); Universal Commc'n Sys., Inc. v. Lycos, Inc., 478 F.3d 413, 419 (1st Cir. 2007); Almeida v. Amazon.com, Inc., 456 F.3d 1316, 1321-22 (11th Cir. 2006); Carafano v. Metrosplash.com, Inc., 339 F.3d 1119, 1123 (9th Cir. 2003). This preference for broad construction recognizes that websites that display third-party content may have an infinite number of users generating an enormous amount of potentially harmful

content, and holding website operators liable for that content "would have an obvious chilling effect" in light of the difficulty of screening posts for potential issues. Zeran, 129 F.3d at 331. The obverse of this proposition is equally salient: Congress sought to encourage websites to make efforts to screen content without fear of liability. See 47 U.S.C. § 230(b)(3)-(4); Zeran, 129 F.3d at 331; see also Lycos, 478 F.3d at 418-19. Such a hands-off approach is fully consistent with Congress's avowed desire to permit the continued development of the internet with minimal regulatory interference. See 47 U.S.C. § 230(a)(4), (b)(2).

In holding Backpage harmless here, the district court found section 230(c)(1) controlling. See Backpage.com, 104 F. Supp. 3d at 154-56. Section 230(c)(1) can be broken down into three component parts. It shields conduct if the defendant (1) "is a 'provider or user of an interactive computer service'; (2) the claim is based on 'information provided by another information content provider'; and (3) the claim would treat [the defendant] 'as the publisher or speaker' of that information." Lycos, 478 F.3d at 418 (quoting 47 U.S.C. § 230(c)(1)). The appellants do not allege that Backpage fails to satisfy either of the first two elements.[4] Instead, they confine themselves to the argument that

_____

[4] Certain amici advance an argument forsworn by the appellants in the district court: that Backpage's activities amount to creating the content of the advertisements. It is, however, clear beyond hope of contradiction that amici cannot "interject into a

- 11 -

their asserted causes of action do not treat Backpage as the publisher or speaker of the contents of the advertisements through which they were trafficked. It is to this argument that we now turn.

The broad construction accorded to section 230 as a whole has resulted in a capacious conception of what it means to treat a website operator as the publisher or speaker of information provided by a third party. Courts have recognized that "many causes of action might be premised on the publication or speaking of what one might call 'information content.'" Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1101 (9th Cir. 2009). The ultimate question, though, does not depend on the form of the asserted cause of action; rather, it depends on whether the cause of action necessarily requires that the defendant be treated as the publisher or speaker of content provided by another. See id. at 1101-02. Thus, courts have invoked the prophylaxis of section 230(c)(1) in connection with a wide variety of causes of action, including housing discrimination, see Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc., 519 F.3d 666, 671-72 (7th Cir. 2008), negligence, see Doe, 528 F.3d at 418; Green v. Am.

---

case issues which the litigants, whatever their reasons might be, have chosen to ignore." Lane v. First Nat'l Bank of Bos., 871 F.2d 166, 175 (1st Cir. 1989).

- 12 -

Online (AOL), 318 F.3d 465, 470-71 (3d Cir. 2003), and securities fraud and cyberstalking, see Lycos, 478 F.3d at 421-22.

The appellants have an uphill climb: the TVPRA claims that they assert appear to treat Backpage as the publisher or speaker of the content of the challenged advertisements. After all, the appellants acknowledge in their complaint that the contents of all of the relevant advertisements were provided either by their traffickers or by the appellants themselves (under orders from their traffickers). Since the appellants were trafficked by means of these advertisements, there would be no harm to them but for the content of the postings.

The appellants nonetheless insist that their allegations do not treat Backpage as a publisher or speaker of third-party content. They rest this hypothesis largely on the text of the TVPRA's civil remedy provision, which provides that victims may bring a civil suit against a perpetrator "or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act" of sex trafficking. 18 U.S.C. § 1595(a); see id. § 1591. Characterizing their allegations as describing "an affirmative course of conduct" by Backpage distinct from the exercise of the "traditional publishing or editorial functions" protected under the CDA, the appellants contend that this course of conduct amounts to participation in sex trafficking

- 13 -

and, thus, can ground liability without treating Backpage as the publisher or speaker of any of the underlying content. This contention comprises more cry than wool.

We begin with the appellants' assertion that Backpage's activities do not involve traditional publishing or editorial functions, and are therefore outside the protective carapace of section 230(c)(1). In support, the complaint describes choices that Backpage has made about the posting standards for advertisements — for example, rules about which terms are permitted or not permitted in a posting, the lack of controls on the display of phone numbers, the option to anonymize e-mail addresses, the stripping of metadata from photographs uploaded to the website, the website's reaction after a forbidden term is entered into an advertisement, and Backpage's acceptance of anonymous payments. The appellants submit that these choices are distinguishable from publisher functions. We disagree.

As an initial matter, some of the challenged practices — most obviously, the choice of what words or phrases can be displayed on the site — are traditional publisher functions under any coherent definition of the term. See Zeran, 129 F.3d at 330 (describing decisions about "whether to publish, withdraw, postpone or alter content" as "traditional editorial functions"). And after careful consideration, we are convinced that the "publisher or speaker" language of section 230(c)(1) extends to

the formulation of precisely the sort of website policies and practices that the appellants assail.

Precedent cinches the matter. In Lycos, we considered the argument that the prophylaxis of section 230(c) did not encompass "decisions regarding the 'construct and operation'" of a defendant's websites. 478 F.3d at 422. There, the plaintiffs alleged that Lycos permitted users to register under multiple screen names and provided links to "objective financial information" from a finance-related message board, thus enabling "individuals to spread misinformation more credibly." Id. at 420. We noted that, at bottom, the plaintiffs were "ultimately alleging that the construct and operation of Lycos's web sites contributed to the proliferation of misinformation" and held that as long as "the cause of action is one that would treat the service provider as the publisher of a particular posting, immunity applies not only for the service provider's decisions with respect to that posting, but also for its inherent decisions about how to treat postings generally." Id. at 422. In short, "Lycos's decision not to reduce misinformation by changing its web site policies was as much an editorial decision with respect to that misinformation as a decision not to delete a particular posting." Id.

The case at hand fits comfortably within this construct. Without exception, the appellants' well-pleaded claims address the structure and operation of the Backpage website, that is,

- 15 -

Backpage's decisions about how to treat postings. Those claims challenge features that are part and parcel of the overall design and operation of the website (such as the lack of phone number verification, the rules about whether a person may post after attempting to enter a forbidden term, and the procedure for uploading photographs). Features such as these, which reflect choices about what content can appear on the website and in what form, are editorial choices that fall within the purview of traditional publisher functions.[5]

At oral argument in this court, the appellants placed particular emphasis on Backpage's provision of e-mail anonymization, forwarding, auto-reply, and storage services to posters. In the last analysis, however, the decision to provide such services and the parallel decision not to impose the same conditions on messaging services as are applied to "Escorts" section postings are no less publisher choices, entitled to the protections of section 230(c)(1).

We add, moreover, that applying section 230(c)(1) to shield Backpage from liability here is congruent with the case law elsewhere. Relying on that provision, courts have rejected claims

---

[5] The appellants argue that a concurring opinion in J.S. v. Village Voice Media Holdings, L.L.C., 359 P.3d 714, 718-24 (Wash. 2015) (en banc) (Wiggins, J., concurring), points to a different conclusion. But our reasoning in Lycos — which the J.S. concurrence failed to address — defeats this argument.

that attempt to hold website operators liable for failing to provide sufficient protections to users from harmful content created by others. For instance, where a minor claimed to have been sexually assaulted by someone she met through the defendant's website and her suit alleged that the website operator "fail[ed] to implement basic safety measures to protect minors," the Fifth Circuit rejected the suit on the basis that the claims were "merely another way of claiming that [the website operator] was liable for publishing the communications and they speak to [the website operator's] role as a publisher of online third-party-generated content." Doe, 528 F.3d at 419-20. Although the appellants try to distinguish Doe by claiming Backpage's decisions about what measures to implement deliberately attempt to make sex trafficking easier, this is a distinction without a difference. Whatever Backpage's motivations, those motivations do not alter the fact that the complaint premises liability on the decisions that Backpage is making as a publisher with respect to third-party content.

Nor does the text of the TVPRA's civil remedy provision change this result. Though a website conceivably might display a degree of involvement sufficient to render its operator both a publisher and a participant in a sex trafficking venture (say, that the website operator helped to procure the underaged youths who were being trafficked), the facts pleaded in the second amended

- 17 -

complaint do not appear to achieve this duality. But even if we assume, for argument's sake, that Backpage's conduct amounts to "participation in a [sex trafficking] venture" — a phrase that no published opinion has yet interpreted — the TVPRA claims as pleaded premise that participation on Backpage's actions as a publisher or speaker of third-party content. The strictures of section 230(c) foreclose such suits.[6]

Contrary to the appellants' importunings, the decision in Barnes does not demand a different outcome. There, the Ninth Circuit concluded that a promissory estoppel claim based on a Yahoo executive's statements that the company would remove explicit photographs that had been posted online without the consent of the person depicted was not barred by section 230(c)(1). See Barnes, 570 F.3d at 1098-99, 1109. Withal, this promissory estoppel claim did not attempt to treat Yahoo as the publisher or speaker of the photograph's content but, instead, the claim sought to hold Yahoo liable for its "manifest intention to be legally obligated to do something" (that is, to delete the photographs). Id. at 1107. No comparable promise has been alleged here.

---

[6] To be sure, the complaint contains a few allegations that do not involve the publication of third-party content. Yet those allegations, treated in detail in Part II(B) infra, rely on sententious rhetoric rather than well-pleaded facts. Thus, they cannot suffice to alter our conclusion here.

- 18 -

That ends this aspect of the matter. We hold that claims that a website facilitates illegal conduct through its posting rules necessarily treat the website as a publisher or speaker of content provided by third parties and, thus, are precluded by section 230(c)(1). This holding is consistent with, and reaffirms, the principle that a website operator's decisions in structuring its website and posting requirements are publisher functions entitled to section 230(c)(1) protection.

In this case, third-party content is like Banquo's ghost: it appears as an essential component of each and all of the appellants' TVPRA claims. Because the appellants' claims under the TVPRA necessarily treat Backpage as the publisher or speaker of content supplied by third parties, the district court did not err in dismissing those claims.[7]

In an effort to shift the trajectory of the debate, the appellants try a pair of end runs. First, the appellants call our attention to section 230(c)(2), which provides that decisions made by website operators to block or remove content are protected from liability as long as they are made in good faith. Building on

---

[7] Although the parties do not separately parse the text of the MATA, those claims fail for essentially the same reasons: they treat Backpage as the publisher or speaker of content provided by third parties. As a result, the MATA — at least in this application — is necessarily inconsistent with the protections provided by section 230(c)(1) and, therefore, preempted. See 47 U.S.C. § 230(e)(3).

this foundation, the appellants assert that the district court relied on Backpage's descriptions of its efforts to block and screen the postings in the "Escorts" section of its website, and that those descriptions amount to an implicit invocation of section 230(c)(2). So, the appellants say, the district court should have allowed discovery into Backpage's good faith (or lack of it) in blocking and screening content. The district court's refusal to allow them to pursue this course, they charge, eviscerates section 230(c)(2) and renders it superfluous.

The appellants start from a faulty premise: we do not read the district court's opinion as relying on Backpage's assertions about its behavior. That Backpage sought to respond to allegations of misconduct by (among other things) touting its efforts to combat sex trafficking does not, without more, invoke section 230(c)(2) as a defense.

The appellants' suggestion of superfluity is likewise misplaced. Courts routinely have recognized that section 230(c)(2) provides a set of independent protections for websites, see, e.g., Barnes, 570 F.3d at 1105; Chi. Lawyers' Comm., 519 F.3d at 670-71; Batzel v. Smith, 333 F.3d 1018, 1030 n.14 (9th Cir. 2003), and nothing about the district court's analysis is at odds with that conclusion.

Next, the appellants suggest that their TVPRA claims are saved by the operation of section 230(e)(1). That provision

declares that section 230 should not "be construed to impair the enforcement of . . . any . . . Federal criminal statute." The appellants posit that the TVPRA's civil suit provision is part of the "enforcement" of a federal criminal statute under the plain meaning of that term and, thus, outside the protections afforded by section 230(c)(1). This argument, though creative, does not withstand scrutiny.

We start with the uncontroversial premise that, where feasible, "a statute should be construed in a way that conforms to the plain meaning of its text." In re Jarvis, 53 F.3d 416, 419 (1st Cir. 1995). The plain-language reading of section 230(e)(1)'s reference to "the enforcement of . . . any . . . Federal criminal statute" dictates a meaning opposite to that ascribed by the appellants: such a reading excludes civil suits. See Backpage.com, 104 F. Supp. 3d at 159 (pointing out that "the common definition of the term 'criminal,' as well as its use in the context of Section 230(e)(1), specifically excludes and is distinguished from civil claims" (quoting Doe v. Bates, No. 5:05-CV-91-DF-CMC, 2006 WL 3813758, at *21 (E.D. Tex. Dec. 27, 2006))). Other traditional tools of statutory construction reinforce this conclusion. Although titles or captions may not be used to contradict a statute's text, they can be useful to resolve textual ambiguities. See Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co., 331 U.S. 519, 528-29 (1947); Berniger v. Meadow Green-Wildcat Corp., 945 F.2d 4,

- 21 -

9 (1st Cir. 1991). Here, the subsection's title, "[n]o effect on criminal law," quite clearly indicates that the provision is limited to criminal prosecutions.

It is equally telling that where Congress wanted to include both civil and criminal remedies in CDA provisions, it did so through broader language. For instance, section 230(e)(4) states that the protections of section 230 should not "be construed to limit the application of the Electronic Communications Privacy Act of 1986," a statute that contains both criminal penalties and civil remedies. See 18 U.S.C. §§ 2511, 2520. Preserving the "application" of this Act contrasts with Congress's significantly narrower word choice in safeguarding the "enforcement" of federal criminal statutes. The normal presumption is that the employment of different words within the same statutory scheme is deliberate, so the terms ordinarily should be given differing meanings. See Sosa v. Alvarez-Machain, 542 U.S. 692, 711 n.9 (2004).

This holding is entirely in keeping with the policies animating section 230(e)(1). Congress made pellucid that it sought "to ensure vigorous enforcement of Federal criminal laws to deter and punish" illicit activities online, 47 U.S.C. § 230(b)(5); and this policy coexists comfortably with Congress's choice "not to deter harmful online speech through the . . . route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages," Lycos, 478 F.3d at 418

- 22 -

(omission in original) (quoting Zeran, 129 F.3d at 330-31). Seen in this light, the distinctions between civil and criminal actions — including the disparities in the standard of proof and the availability of prosecutorial discretion — reflect a legislative judgment that it is best to avoid the potential chilling effects that private civil actions might have on internet free speech.

To say more about these attempted end runs would be pointless. They are futile, and do not cast the slightest doubt on our conclusion that the district court appropriately dismissed the appellants' sex trafficking claims as barred by section 230(c)(1).

### B. Chapter 93A Claims.

We turn next to the appellants' state-law unfair trade practices claims. A Massachusetts statute, familiarly known as Chapter 93A, creates a private right of action in favor of any individual "who has been injured by another person's use or employment" of unfair or deceptive business practices. See Mass. Gen. Laws ch. 93A, § 9(1). The appellants' Chapter 93A claims (as framed on appeal) target misrepresentations allegedly made by Backpage to law enforcement and the NCMEC regarding Backpage's efforts at self-regulation. The district court jettisoned these claims, concluding that the causal chain alleged by the appellants was "too speculative to fall as a matter of law within the penumbra

of reasonabl[e] foreseeability." Backpage.com, 104 F. Supp. 3d at 162.

As this ruling hinges on the plausibility of the appellants' allegations of causation, we first rehearse the plausibility standard. It is, of course, apodictic that a plaintiff must supply "a short and plain statement of the claim showing that [she] is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although this requirement does not call for the pleading of exquisite factual detail, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).

Evaluating the plausibility of a complaint is a two-step process. First, "the court must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012). Second, the court must determine whether the remaining facts allow it "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). In carrying out this evaluation, the court must view the claim as a whole, instead of demanding "a one-to-one relationship between any single allegation and a necessary element of the cause of action." Rodríguez-Reyes v. Molina-Rodríguez, 711 F.3d 49, 55 (1st Cir. 2013).

With this standard in mind, we proceed to the appellants' assignment of error. To prevail on a Chapter 93A claim of this sort, the "plaintiff must prove causation — that is, the plaintiff is required to prove that the defendant's unfair or deceptive act caused an adverse consequence or loss." Rhodes v. AIG Domestic Claims, Inc., 961 N.E.2d 1067, 1076 (Mass. 2012). This requirement entails showing both "a causal connection between the deception and the loss and that the loss was foreseeable as a result of the deception." Smith v. Jenkins, 732 F.3d 51, 71 (1st Cir. 2013) (quoting Casavant v. Norwegian Cruise Line Ltd., 952 N.E.2d 908, 912 (Mass. 2011)). In other words, the plaintiff must lay the groundwork for findings of both actual and proximate causation. If an examination of the claim leads to the conclusion that it fails plausibly to allege a causal chain sufficient to ground an entitlement to relief, that claim is susceptible to dismissal under Rule 12(b)(6). See A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 82 & n.2 (1st Cir. 2013).

Here, the second amended complaint attempts to forge the causal chain as follows: Backpage made a series of disingenuous representations to law enforcement officers and the NCMEC regarding its supposed commitment to combating sex trafficking, including representations about technical changes to its website and its efforts to screen and monitor postings; Backpage neither kept these commitments nor made the technical changes that had

- 25 -

been discussed; instead, Backpage engaged in a series of pretextual actions to generate the appearance of combating sex trafficking (though it knew that these actions would not actually eliminate sex trafficking from the website); this amalgam of misrepresentations and deceptive practices "minimized and delayed" any real scrutiny of what Backpage was actually doing, thus allowing Backpage to gain a dominant market share in the online advertising of sex trafficking; and this sequence of events harmed the appellants by increasing their risk of being trafficked.

This causal chain is shot through with conjecture: it pyramids speculative inference upon speculative inference. This rampant guesswork extends to the effect of the alleged misrepresentations on an indeterminate number of third parties, the real impact of Backpage's behavior on the overall marketplace for sex trafficking, and the odds that the appellants would not have been victimized had Backpage been more forthright.

When all is said and done, it is apparent that the attenuated causal chain proposed by the appellants is forged entirely out of surmise. Put another way, the causation element is backed only by "the type of conclusory statement[s] that need not be credited at the Rule 12(b)(6) stage." Maddox, 732 F.3d at 80. Charges hinting at Machiavellian manipulation (such as the charge that Backpage's "communications with NCMEC were simply an effort to create a diversion as Backpage.com solidified its market

position" or the charge that Backpage's posting review program "appears to be merely superficial") cannot serve as surrogates for well-pleaded facts.

To be sure, the complaint does plead a few hard facts. For example, it indicates that some meetings occurred involving Backpage and the NCMEC. It also indicates that Backpage made some efforts (albeit not the ones that the NCMEC recommended) to address sex trafficking. But beyond these scanty assertions, the complaint does not offer factual support for its attenuated causal analysis.

In an effort to plug this gaping hole, the appellants argue that in a Chapter 93A case the plausibility of causation should be tested at the pleading stage not by looking at facts but, rather, by employing "common economic sense." Bos. Cab Dispatch, Inc. v. Uber Techs., Inc., No. 13-10769, 2015 WL 314131, at *4 (D. Mass. Jan. 26, 2015); accord Katin v. Nat'l Real Estate Info. Servs., Inc., No. 07-10882, 2009 WL 929554, at *7, *10 (D. Mass. Mar. 31, 2009). Yet, facts are the linchpin of plausibility; and the cases that the appellants cite are inapposite. Those cases involve competitors suing each other pursuant to section 11 of Chapter 93A. This distinction is significant because although causation in section 11 cases between competitors turns on the decisions of third parties (customers), the causal chain between the unfair act and the harm to the plaintiff is much shorter and

more direct than the chain that the appellants so laboriously attempt to construct.

The short of it is that the pertinent allegations in the second amended complaint are insufficient "to remove the possibility of relief from the realm of mere conjecture." Tambone, 597 F.3d at 442. It follows inexorably that the district court did not err in dismissing the appellants' Chapter 93A claims.[8]

## C. **Intellectual Property Claims.**

This brings us to the appellants' intellectual property claims. Section 230 provides that "[n]othing in this section shall be construed to limit or expand any law pertaining to intellectual property." 47 U.S.C. § 230(e)(2). We assume, without deciding, that the appellants' remaining claims come within the compass of this exception.[9]

---

[8] For the sake of completeness, we note that the court below held, in the alternative, that the appellants' Chapter 93A claims were barred by section 230(c)(1). See Backpage.com, 104 F. Supp. 3d at 162-63. We express no opinion on this alternative holding.

[9] The application of the exemption to the appellants' state law claims for the unauthorized use of pictures is not free from doubt. At least one court of appeals has suggested that state law intellectual property claims are not covered by this exemption. See Perfect 10, Inc. v. CCBill LLC, 488 F.3d 1102, 1118-19, 1119 n.5 (9th Cir. 2007); but cf. Lycos, 478 F.3d at 422-23, 423 n.7 (applying section 230(e)(2) to a claim under state trademark law, albeit without detailed analysis). To make a muddled matter even murkier, Backpage argues that the unauthorized use of pictures claims do not involve intellectual property but, rather, stem from privacy rights protected by tort law. We need not reach either of these issues.

**1. Unauthorized Use of Pictures of a Person.** All of the appellants brought claims under state laws (Massachusetts and/or Rhode Island) guarding against the unauthorized use of a person's picture. See Mass. Gen. Laws ch. 214, § 3A; R.I. Gen. Laws § 9-1-28. These nearly identical statutes, reprinted in relevant part in the margin,[10] confer private rights of action upon individuals whose images are used for commercial purposes without their consent. The appellants insist that Backpage, by garnering advertising revenues from their traffickers, profited from the unauthorized use of their photographs. This fusillade is wide of

---

[10] Mass. Gen. Laws ch. 214, § 3A provides in relevant part that:

> Any person whose name, portrait or picture is used within the commonwealth for advertising purposes or for the purposes of trade without his written consent may bring a civil action . . . against the person so using his name, portrait or picture, to prevent and restrain the use thereof; and may recover damages for any injuries sustained by reason of such use.

R.I. Gen. Laws § 9-1-28(a) provides, as pertinent here, that:

> Any person whose name, portrait, or picture is used within the state for commercial purposes without his or her written consent may bring an action . . . against the person so using his or her name, portrait, or picture to prevent and restrain the use thereof, and may recover damages for any injuries sustained by reason of such use.

To the modest extent that the wording of these statutes differs, neither the appellants nor Backpage suggests that the differences affect our analysis in any way. We therefore treat the statutes interchangeably.

the mark: the statutes in question impose liability only upon persons or entities who deliberately use another's image for commercial gain. As we explain below, Backpage (on the facts alleged here) is not such an entity.

Neither the Massachusetts Supreme Judicial Court (SJC) nor the Rhode Island Supreme Court has confronted the exact scenario that is presented here. Our task, then, is to make an informed determination of how each court would rule if it faced the question, taking into account analogous state decisions, cases from other jurisdictions, learned treatises, and relevant policy rationales. See Andrew Robinson Int'l, Inc. v. Hartford Fire Ins. Co., 547 F.3d 48, 51-52 (1st Cir. 2008). Here, the tea leaves are easy to read.

The SJC has articulated the key point in the following way: "the crucial distinction . . . must be between situations in which the defendant makes an incidental use of the plaintiff's name, portrait or picture and those in which the defendant uses the plaintiff's name, portrait or picture deliberately to exploit its value for advertising or trade purposes." Tropeano v. Atl. Monthly Co., 400 N.E.2d 847, 850 (Mass. 1980). Exploitation for advertising or trade purposes requires that the use of the image be "for the purpose of appropriating to the defendant's benefit the commercial or other values associated with the name or likeness." Id. (quoting Nelson v. Me. Times, 373 A.2d 1221, 1224

- 30 -

(Me. 1977)).  So, too, the nearly identical Rhode Island statute requires a showing that by using the image "the defendant commercially exploited [the plaintiff] without his permission." Leddy v. Narragansett Television, L.P., 843 A.2d 481, 490 (R.I. 2004); accord Mendonsa v. Time Inc., 678 F. Supp. 967, 971 (D.R.I. 1988).

The appellants argue that the use of their images cannot be written off as incidental because their pictures were "the centerpieces of commercial advertisements."  But this argument misapprehends both the case law and the rationale that animates the underlying right.  Tropeano exemplifies the point.  That case involved the publication of the plaintiff's image to illustrate a magazine article in which she was not even mentioned.  See 400 N.E.2d at 848.  The SJC concluded that this was an incidental use of the image, notwithstanding that the article and accompanying picture could be said to benefit the publisher.  See id. at 851. The fact that the publisher was a for-profit business did "not by itself transform the incidental publication of the plaintiff's picture into an appropriation for advertising or trade purposes." Id.

In our view, Tropeano establishes that even a use leading to some profit for the publisher is not a use for advertising or trade purposes unless the use is designed to "appropriat[e] to the defendant's benefit the commercial or other values associated with

- 31 -

the name or likeness." Id. at 850 (quoting Nelson, 373 A.2d at 1224). That is the rule in Massachusetts, and we are confident that essentially the same rule prevails in Rhode Island.

Here, there is no basis for an inference that Backpage appropriated the commercial value of the appellants' images. Although Backpage does profit from the sale of advertisements, it is not the entity that benefits from the misappropriation. A publisher like Backpage is "merely the conduit through which the advertising and publicity matter of customers" is conveyed, Cabaniss v. Hipsley, 151 S.E.2d 496, 506 (Ga. Ct. App. 1966), and the party who actually benefits from the misappropriation is the advertiser. Matters might be different if Backpage had used the pictures to advertise its own services, see id., but the appellants proffer no such claim.

Basic policy considerations reinforce this result. There would be obviously deleterious consequences to a rule placing advertising media, such as newspapers, television stations, or websites, at risk of liability every time they sell an advertisement to a party who engages in misappropriation of another person's likeness. Given this verity, it is hardly surprising that the appellants have identified no case in which a publisher of an advertisement furnished by a third party has been held liable for a misappropriation present within it. The proper target of any suit for damages in such a situation must be the advertiser

who increases his own business through the misappropriation (in this case, the traffickers).[11]

We need not tarry.  On this understanding, we uphold the district court's dismissal of the appellants' claims under the aforementioned state statutes.

**2.  Copyright.**  The last leg of our journey takes us to a singular claim of copyright infringement.  Shortly after the institution of suit, Doe #3 registered a copyright in one of the photographs used by her traffickers.  In the second amended complaint, she included a claim for copyright infringement.  The court below dismissed this claim, reasoning that it identified no redressable injury.  See Backpage.com, 104 F. Supp. 3d at 165. Doe #3 challenges this ruling.

Assuming (without deciding) that Backpage could be held liable for copyright infringement, the scope of Doe #3's potential recovery is limited by the fact that she did not register her copyright until December of 2014 — after the instant action had been filed.  By then, Backpage was no longer displaying the copyrighted image.  Given the timing of these events, Doe #3 cannot recover either statutory damages or attorneys' fees under the

---

[11] This is precisely the situation reflected in the earliest right of privacy cases, see, e.g., Henry v. Cherry & Webb, 73 A. 97 (R.I. 1909), and the state statutes in this case are designed to codify liability for that sort of commercial conduct, see Mendonsa, 678 F. Supp. at 969-70; Tropeano, 400 N.E.2d at 850-51.

Copyright Act. See 17 U.S.C. § 412; Johnson v. Gordon, 409 F.3d 12, 20 (1st Cir. 2005). Any recovery would be restricted to compensatory damages under 17 U.S.C. § 504(b), which permits a successful suitor to recover "the actual damages suffered by . . . her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages."

The prospect of such a recovery, however, is purely theoretical: nothing in the complaint raises a plausible inference that Doe #3 can recover any damages, or that discovery would reveal such an entitlement. See Twombly, 550 U.S. at 556 (stating that factual allegations must at least "raise a reasonable expectation that discovery will reveal evidence" to suffice as plausible). A showing of actual damages requires a plaintiff to prove "that the infringement was the cause of [her] loss of revenue." Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1170 (1st Cir. 1994). Such a loss is typically measured by assessing the diminution in a copyrighted work's market value (say, by calculating lost licensing fees). See Bruce v. Weekly World News, Inc., 310 F.3d 25, 28-29 (1st Cir. 2002); Data Gen., 36 F.3d at 1170. No facts set forth in the second amended complaint suggest that the market value of Doe #3's image has been affected in any way by the alleged infringement, and Doe #3 points to nothing that might plausibly support such an inference.

By the same token, nothing in the complaint plausibly suggests a basis for a finding that Doe #3 would be entitled to profits attributable to the infringement. The closest that the complaint comes is an optimistic assertion that because photographs "enhance the effectiveness of advertisements," Backpage necessarily reaps a financial benefit from these images (including, presumably, Doe #3's photograph). But a generalized assertion that a publisher/infringer profits from providing customers with the option to display photographs in advertisements, standing alone, cannot plausibly be said to link the display of a particular image to some discrete portion of the publisher/infringer's profits. Cf. Mackie v. Rieser, 296 F.3d 909, 914-16 (9th Cir. 2002) (concluding, at summary judgment, that the effect of including a photograph in an advertising brochure was too speculative to make out a triable issue on advertiser's profits attributable to infringement). In short, the link that Doe #3 attempts to fashion between the copyrighted photograph and Backpage's revenues is wholly speculative and, thus, does not cross the plausibility threshold. After all, "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

In a last ditch effort to bell the cat, Doe #3 contends that the district court erred in failing to determine whether she was entitled to injunctive relief under 17 U.S.C. § 502(a), which

- 35 -

permits such relief "to prevent or restrain infringement of a copyright." She says, in effect, that Backpage may still possess the copyrighted photograph and that, therefore, she remains at risk of future infringement. We reject this contention.

To begin, the mere fact of past infringement does not entitle a plaintiff to permanent injunctive relief: the plaintiff must also show "a substantial likelihood of infringement in the future." Harolds Stores, Inc. v. Dillard Dep't Stores, Inc., 82 F.3d 1533, 1555 (10th Cir. 1996); see 5 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 14.06[B][1][a] (2015). Nothing in the complaint suggests that there is any substantial likelihood of future infringement by Backpage with respect to the copyrighted photograph. The known facts strongly suggest that no such risk exists: the photograph was posted by a third party who no longer has any sway over Doe #3, and Backpage is not alleged to post material or create advertisements entirely of its own accord. Thus, any fears of future infringement would appear to be unfounded.

Viewing the complaint as a whole, see Twombly, 550 U.S. at 569 n.14, we conclude that the distinctive facts alleged here simply do not suffice to ground a finding that Doe #3 is plausibly entitled to any relief on her copyright claim. Consequently, we discern no error in the district court's dismissal of this claim.

- 36 -

## III.  CONCLUSION

As a final matter, we add a coda.  The appellants' core argument is that Backpage has tailored its website to make sex trafficking easier.  Aided by the amici, the appellants have made a persuasive case for that proposition.  But Congress did not sound an uncertain trumpet when it enacted the CDA, and it chose to grant broad protections to internet publishers.  Showing that a website operates through a meretricious business model is not enough to strip away those protections.  If the evils that the appellants have identified are deemed to outweigh the First Amendment values that drive the CDA, the remedy is through legislation, not through litigation.

We need go no further.  For the reasons elucidated above, the judgment of the district court is affirmed.  All parties shall bear their own costs.


**Affirmed.**