ROTH, Circuit Judge:
 

 On January 12, 2015, Heather Oberdorf returned home from work, put a retractable leash on her dog, and took the dog for a walk. Unexpectedly, the dog lunged, causing the D-ring on the collar to break and the leash to recoil back and hit Oberdorf's face and eyeglasses. As a result, Oberdorf is permanently blind in her left eye.
 

 Oberdorf bought the collar on Amazon.com. As a result of the accident, she sued Amazon.com, including claims for strict products liability and negligence. The District Court found that, under Pennsylvania law, Amazon was not liable for Oberdorf's injuries. In its opinion, the District Court emphasized that a third-party vendor-rather than Amazon itself-listed the collar on Amazon's online marketplace and shipped the collar directly to Oberdorf. Those facts were the basis for the District Court's two main rulings.
 

 First, the District Court found that Amazon is not subject to strict products liability claims because Amazon is not a "seller" under Pennsylvania law. Second, the District Court found that Oberdorf's claims are barred by the Communications Decency Act (CDA) because she seeks to hold Amazon liable for its role as the online publisher of third-party content.
 

 I
 

 Both issues in this case pertain to Amazon's role in effectuating the sale of products offered by third-party vendors. Therefore, we begin by describing the anatomy of a sale on Amazon.com.
 
 [1]
 

 Amazon Marketplace
 

 Amazon is the world's most valuable retail company.
 
 [2]
 
 Its website is an online marketplace
 where Amazon retails its own products as well as those of more than one million third-party vendors.
 
 [3]
 
 These third-party vendors decide which products to sell, the means of shipping, and product pricing. For its part, Amazon lists the products on the Amazon Marketplace, collects order information from consumers, and processes payments. In exchange for these services, Amazon collects fees from each third-party vendor.
 

 In order to use Amazon's services, a third-party vendor must assent to Amazon's Services Business Solutions Agreement. This Agreement governs every step of the sales process.
 

 Once a third-party vendor has assented to the Agreement, the vendor chooses which product or products it would like to sell using Amazon's website. This choice is, with some notable exceptions, left to the discretion of the vendor. Among the exceptions are products that Amazon determines are illegal, sexually explicit, defamatory, or obscene.
 

 When the third-party vendor has chosen a product that it wants to offer on Amazon's website, the vendor provides Amazon with a description of the product, including its brand, model, dimensions, and weight. Pursuant to the Agreement, the vendor must also provide Amazon with digital images of the product, as well as other information such as shipping and handling options, product availability, in-stock status, and any other information reasonably requested by Amazon.
 

 Based on this information, Amazon formats the product's listing on its website. This function, too, is provided for in the Agreement, by which Amazon retains the right in its sole discretion to determine the content, appearance, design, functionality, and all other aspects of the Services, including by redesigning, modifying, removing, or restricting access to any of them. In fact, the Agreement grants Amazon a royalty-free, non-exclusive, worldwide, perpetual, irrevocable right and license to commercially or non-commercially exploit in any manner, the information provided by third-party vendors.
 

 The third-party vendor can then choose which, if any, of Amazon's other services it will use in conjunction with listing its product on Amazon's website. For example, Amazon offers "Amazon Clicks," an advertising service in which Amazon highlights and promotes the vendor's product to customers. Amazon also offers a "Fulfillment by Amazon" service, in which it takes physical possession of third-party vendors' products and ships those products to consumers. Otherwise, the vendor itself is responsible for shipping products directly to consumers.
 

 The listed price for the product is chosen by the third-party vendor, subject to one exception: Vendors may not charge more on Amazon than they charge in other sales channels. Nor, according to the Agreement, may third-party vendors offer inferior customer service or provide lower quality information about products than in other sales channels. To the extent that third-party vendors need to communicate with customers regarding their orders on Amazon, they must do so through the Amazon platform.
 

 With these preliminaries completed, Amazon lists the product online and sales begin. As customers make purchases on Amazon's website, Amazon collects payment
 and delivers order information to the third-party vendor. At checkout, the customer can choose any shipping method offered by the third-party vendor, and any promises made by the vendor with respect to shipping date must be met. Amazon ensures compliance with this obligation by requiring the vendor to send Amazon shipping information for each order. In addition, vendors have a powerful interest in providing quality products and ensuring timely delivery, as Amazon allows shoppers to publicly rate the vendors and their products.
 

 In exchange for its role in the transaction, Amazon collects two types of fees: one is a commission, typically between seven and fifteen percent of the overall sales price; the other is either a per-item or monthly fee, depending on the third-party vendor's preference. At least once every two weeks, Amazon remits all sales proceeds, minus fees, to the vendor. Pursuant to the Agreement, Amazon is classified as the third-party vendor's "agent for purposes of processing payments, refunds, and adjustments ... receiving and holding Sales Proceeds on your behalf, remitting Sales Proceeds to Your Bank Account, charging your Credit Card, and paying Amazon and its Affiliates amounts you owe ...."
 
 [4]
 

 Throughout each step of the sales process, Amazon may at any time cease providing any or all of the Services at its sole discretion and without notice, including suspending, prohibiting, or removing any listing. Amazon also retains other important privileges. For example, Amazon can require vendors to stop or cancel orders of any product. If Amazon determines that a vendor's actions or performance may result in risks to Amazon or third parties, it may in its sole discretion withhold any payments to the vendor. Furthermore, Amazon requires that its vendors release it and agree to indemnify, defend, and hold it harmless against any claim, loss, damage, settlement, cost, expense, or other liability.
 

 The Dog Collar
 

 On December 2, 2014, Heather Oberdorf logged onto Amazon's website. She typed search information for dog collars into Amazon's search terms box. She decided to purchase the dog collar at issue, which was sold by a third-party vendor, "The Furry Gang." The Furry Gang shipped the dog collar directly from Nevada to Oberdorf, who put the collar on her dog, Sadie. Then, on January 12, 2015, while Oberdorf was walking Sadie, the D-ring on the collar broke and the retractable leash recoiled into Oberdorf's eyeglasses, injuring her and permanently blinding her in her left eye.
 

 Neither Amazon nor Oberdorf has been able to locate a representative of The Furry Gang, which has not had an active account on Amazon.com since May 2016.
 

 Procedural History
 

 Oberdorf filed a complaint in the United States District Court for the Middle District of Pennsylvania, bringing claims for strict product liability, negligence, breach of warranty, misrepresentation, and loss of consortium.
 
 [5]
 
 Oberdorf propounds two separate theories of strict product liability: (1) failure to provide adequate warnings regarding the use of the dog collar, and (2) defective design of the dog collar. She also asserts a variety of negligence theories, namely that Amazon was negligent in (1) distributing, inspecting, marketing, selling,
 and testing of the dog collar in an unreasonable manner; (2) allowing the dog collar to enter the stream of commerce in a dangerous condition; (3) failing to conduct a proper hazard analysis; (4) failing to follow the guidelines of the "safety hierarchy"; and (5) failing to provide the product with features, elements, precautions, or warnings that would have made it safer.
 

 The District Court granted Amazon's motion for summary judgment, finding that (1) Amazon cannot be sued under Pennsylvania's strict products liability law because it does not constitute a "seller" within the meaning of Pennsylvania strict liability law, and (2) Oberdorf's claims are barred by the CDA because she seeks to hold Amazon liable for its role as the online publisher of a third party's content.
 

 II
 

 The District Court had jurisdiction pursuant to
 
 28 U.S.C. § 1332
 
 . We have jurisdiction pursuant to
 
 28 U.S.C. § 1291
 
 . Because our review of a district court's grant of summary judgment is plenary, we affirm only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."
 
 [6]
 
 In determining whether summary judgment is appropriate, we view all facts and make all reasonable inferences in favor of the non-moving party, in this case, the Oberdorfs.
 
 [7]
 

 III
 

 We begin our analysis by addressing Amazon's contention that it is not subject to Oberdorf's strict products liability claims.
 

 Because our subject matter jurisdiction stems from the parties' diverse citizenship, we apply Pennsylvania law in deciding whether the District Court properly dismissed Oberdorf's strict products liability claim.
 
 [8]
 
 The Pennsylvania Supreme Court has made clear that the Second Restatement of Torts § 402A applies to Pennsylvania strict products liability claims.
 
 [9]
 
 Section 402A specifically limits strict products liability to "sellers" of products.
 
 [10]
 
 Amazon relies on this limitation as its defense, claiming that it is not a "seller" because it merely provides an online marketplace for products sold by third-party vendors. We disagree.
 
 [11]
 

 A
 

 Amazon relies heavily on the Pennsylvania Supreme Court's decision in
 
 Musser v. Vilsmeier Auction Co, Inc.
 

 [12]
 
 to support its contention that it is not a "seller." Although
 
 Musser
 
 is a significant case to which we look for guidance, it does not command the result that Amazon seeks.
 

 The plaintiff in
 
 Musser
 
 was injured by a tractor that his father had bought at an auction house. Following his injury, he sought to hold the auction house strictly liable as a "seller" of the allegedly defective tractor. The Pennsylvania Supreme Court held that the auction house could not be considered a "seller," and thus that the plaintiff must prove that the auction house acted unreasonably (i.e., bring a negligence claim) in order to hold it liable.
 
 [13]
 
 In making this ruling, the court relied on the policy rationale articulated in comment f of § 402A of the Second Restatement of Torts:
 

 The basis of the rule is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings with products which may endanger the safety of their persons and property, and the forced reliance upon that undertaking on the part of those who purchase such goods. This basis is lacking in the case of the ordinary individual who makes the isolated sale, and he is not liable to a third person or even to his buyer in the absence of his negligence.
 
 [14]
 

 The court noted that, when the above policy rationale "will not be served, persons whose implication in supplying products is tangential to that undertaking will not be subjected to strict liability for the harms caused by defects in the products."
 
 [15]
 
 Therefore, because "[t]he auction company merely provided a market as the agent of the seller," the court concluded that applying strict liability doctrine to the auction house would not further the doctrine's underlying policy justification.
 
 [16]
 

 In its opinion, the Pennsylvania Supreme Court made clear that courts later tasked with determining whether an actor is a "seller" should consider whether the following four factors apply:
 

 (1) Whether the actor is the "only member of the marketing chain available to the injured plaintiff for redress";
 

 (2) Whether "imposition of strict liability upon the [actor] serves as an incentive to safety";
 

 (3) Whether the actor is "in a better position than the consumer to prevent the circulation of defective products"; and
 

 (4) Whether "[t]he [actor] can distribute the cost of compensating for injuries resulting from defects by charging for it in his business, i.e., by adjustment of the rental terms."
 
 [17]
 

 We consider below each of the four factors articulated in
 
 Musser
 
 .
 

 1
 

 The first factor is whether Amazon "may be the only member of the marketing
 chain available to the injured plaintiff for redress."
 
 [18]
 
 In
 
 Musser
 
 , the court found that this factor failed to support a finding that the auction house was a "seller" because in an auction there is a vendor, for whom the auctioneer is the agent and who may be amenable to suit under § 402A for negligence or breach of warranty.
 
 [19]
 
 In other words, the plaintiff in
 
 Musser
 
 could sue the other parties in the sales distribution chain.
 

 Amazon contends that, just as every item offered at an auction house can be traced to a seller who may be amenable to suit, every item on Amazon's website can be traced to a third-party vendor. However, Amazon fails to account for the fact that under the Agreement, third-party vendors can communicate with the customer only through Amazon. This enables third-party vendors to conceal themselves from the customer, leaving customers injured by defective products with no direct recourse to the third-party vendor. There are numerous cases in which neither Amazon nor the party injured by a defective product, sold by Amazon.com, were able to locate the product's third-party vendor or manufacturer.
 
 [20]
 

 In this case, Amazon's Vice President of Marketing Business admitted that Amazon generally takes no precautions to ensure that third-party vendors are in good standing under the laws of the country in which their business is registered. In addition, Amazon had no vetting process in place to ensure, for example, that third-party vendors were amenable to legal process. After Oberdorf was injured by the defective collar, neither she nor Amazon was able to locate The Furry Gang. As a result, Amazon now stands as the only member of the marketing chain available to the injured plaintiff for redress.
 

 The first factor weighs in favor of imposing strict liability on Amazon.
 
 [21]
 

 2
 

 The second factor we consider is whether "imposition of strict liability upon the [actor would] serve[ ] as an incentive to safety."
 
 [22]
 
 In
 
 Musser
 
 , the Pennsylvania Supreme Court "fail[ed] to see how the imposition of strict liability [on the auction house] would be more than a futile gesture in promoting the manufacture and distribution of safer products," chiefly because the auction house was "not in the business
 of designing and/or manufacturing any particular product or products."
 
 [23]
 
 Amazon asserts that it does not have a relationship with the designers or manufacturers of products offered by third-party vendors. Therefore, it contends that imposing strict liability would not be an incentive for safer products. Again, we disagree with Amazon.
 

 Although Amazon does not have direct influence over the design and manufacture of third-party products, Amazon exerts substantial control over third-party vendors. Third-party vendors have signed on to Amazon's Agreement, which grants Amazon "the right in [its] sole discretion to ... suspend[ ], prohibit[ ], or remov[e] any [product] listing,"
 
 [24]
 
 "withhold any payments" to third-party vendors,
 
 [25]
 
 "impose transaction limits,"
 
 [26]
 
 and "terminate or suspend ... any Service [to a third-party-vendor] for any reason at any time."
 
 [27]
 
 Therefore, Amazon is fully capable, in its sole discretion, of removing unsafe products from its website. Imposing strict liability upon Amazon would be an incentive to do so.
 

 The second factor favors imposing strict liability on Amazon.
 
 [28]
 

 3
 

 The third factor we consider is whether Amazon is "in a better position than the consumer to prevent the circulation of defective products."
 
 [29]
 

 In
 
 Musser
 
 , the court indicated that the auctioneer was not in a better position than the consumer to prevent the circulation of defective products because it lacked an "ongoing relationship with the manufacturer from which some financial advantage inures to [its] benefit ...."
 
 [30]
 
 Similarly, in
 
 Nath v. National Equipment Leasing Corp.
 
 ,
 
 [31]
 
 the Pennsylvania Supreme Court held that, because financing agencies perform only a "tangential" role in the sales process, "their relationship with a particular manufacturer does not, in the normal course, possess the continuity of transactions that would provide a basis for indirect influence over the condition and the safety of the product."
 
 [32]
 
 Here, while Amazon may at times lack continuous relationships with a third-party vendor, the potential for continuing sales encourages an on-going relationship between Amazon and the third-party vendors.
 

 Moreover, Amazon is uniquely positioned to receive reports of defective products, which in turn can lead to such products being removed from circulation. Amazon's website, which Amazon in its sole discretion has the right to manage, serves as the public-facing forum for
 products listed by third-party vendors. In its contract with third-party vendors, Amazon already retains the ability to collect customer feedback: "We may use mechanisms that rate, or allow shoppers to rate, Your Products and your performance as a seller and Amazon may make these ratings and feedback publicly available."
 
 [33]
 
 Third-party vendors, on the other hand, are ill-equipped to fulfill this function, because Amazon specifically curtails the channels that third-party vendors may use to communicate with customers: "[Y]ou may only use tools and methods that we designate to communicate with Amazon site users regarding Your Transactions ...."
 
 [34]
 

 The third factor also weighs in favor of imposing strict liability on Amazon.
 
 [35]
 

 4
 

 The fourth factor we consider is whether Amazon can distribute the cost of compensating for injuries resulting from defects.
 

 In
 
 Musser
 
 , the court "acknowledge[d] that it would be possible for the auctioneer to pass on the costs of imposing strict liability upon him; possibly as [the injured plaintiff] suggests, by indemnity agreements between the auctioneer and the seller."
 
 [36]
 
 However, although the court found that extending the meaning of "seller" to include the auctioneer would provide another remedy for injured customers, the court demurred, stating that this would "only marginally" promote the "purpose of the policy considerations" underlying § 402A.
 
 [37]
 

 In this case, however, Amazon has already provided for indemnification by virtue of a provision in the Agreement:
 

 You release us and agree to indemnify, defend, and hold harmless us, our Affiliates, and our and their respective officers, directors, employees, representatives, and agents against any claim, loss, damage, settlement, cost, expense, or other liability (including, without limitation, attorneys' fees) ....
 
 [38]
 

 Moreover, Amazon can adjust the commission-based fees that it charges to third-party vendors based on the risk that the third-party vendor presents.
 

 Amazon's customers are particularly vulnerable in situations like the present case. Neither the Oberdorfs nor Amazon has been able to locate the third-party vendor, The Furry Gang. Conversely, had there been an incentive for Amazon to keep track of its third-party vendors, it might have done so.
 

 The fourth factor also weighs in favor of imposing strict liability on Amazon. Thus, although the four-factor test yielded a different result when applied by the
 
 Musser
 
 court to an auction house, all four factors
 in this case weigh in favor of imposing strict liability on Amazon.
 
 [39]
 

 B
 

 We do not rely exclusively upon the four-factor test to reach our conclusion that Amazon is subject to strict products liability claims for sales involving third-party vendors. Our reasoning is consistent with that in other Pennsylvania cases.
 

 Notably, in
 
 Hoffman v. Loos & Dilworth, Inc.
 
 ,
 
 [40]
 
 the Pennsylvania Superior Court decided that a sales agent was a "seller" under § 402A, and thus subject to strict product liability under Pennsylvania law.
 
 [41]
 
 Although
 
 Hoffman
 
 predates
 
 Musser
 
 , its holding remains valid, as neither
 
 Musser
 
 nor any subsequent decision by the Pennsylvania Supreme Court has called
 
 Hoffman
 
 's holding into question.
 
 [42]
 
 Moreover,
 
 Hoffman
 
 addresses Amazon's main argument: Amazon claims that it cannot be considered a "seller" because it does not take title to or possession of the products sold by third-party vendors. The court held in
 
 Hoffman
 
 that under Pennsylvania law a participant in the sales process can be held strictly liable for injuries resulting from defective products, even if the participant does not take title or possession of those products.
 
 [43]
 

 Hoffman
 
 involved bulk sales of linseed oil. The manufacturer's sales agent, E.W. Kaufmann Co., would transmit orders for linseed oil from the packager to the distributor. That was Kaufmann's only role in the sales process. As part of the summary judgment briefing in
 
 Hoffman
 
 , Kaufmann submitted an affidavit from its principal executive, stating that it did not take title, possession, or ownership of any of the relevant linseed oil during the distribution or sales process.
 
 [44]
 
 Nonetheless, the court made clear that strict liability in Pennsylvania is properly extended "to anyone 'who enters into the business of supplying human beings with products which may endanger the safety of their persons and property.' "
 
 [45]
 
 Because Kaufmann's tasks amounted to being "in the business of selling or marketing merchandise," rather than performing a "tangential" role, it could be held strictly liable for injuries resulting from defects in that merchandise.
 
 [46]
 

 In reaching this conclusion, the court discussed two prior Pennsylvania Supreme Court cases, both of which also inform our judgment that Amazon is subject to strict liability. The first of these is
 
 Francioni v. Gibsonia Truck Corp.
 
 ,
 
 [47]
 
 in which the Pennsylvania Supreme Court decided that the term "seller," as used in § 402A, does not limit strict products liability to the context of sales; that is to say, the term "seller" can also extend to lessors and bailors. The court held that strict products liability should be applied broadly to those who market products, "whether by sale, lease or bailment, for use and consumption by the public."
 
 [48]
 

 Four years later, in
 
 Nath v. National Equipment Leasing Corp.
 
 ,
 
 [49]
 
 the Pennsylvania Supreme Court declined to extend the application of strict product liability to financial lessors because the financial lessor's "participation in the chain of events was tangential," in such a way that it "was not able to, nor would it have been in a position to, effect or oversee the safety of the product."
 
 [50]
 
 The core of the court's logic was that "[a] finance lessor is not in the business of selling or marketing merchandise," but rather it "is in the business of circulating funds."
 
 [51]
 

 In this case, Amazon's role extends beyond that of the
 
 Hoffman
 
 sales agent, who in exchange for a commission merely accepted orders and arranged for product shipments. Amazon not only accepts orders and arranges for product shipments, but it also exerts substantial market control over product sales by restricting product pricing, customer service, and communications with customers.
 
 [52]
 
 Amazon's involvement, in other words, resembles but also exceeds that of the sales agent labeled a "seller" in
 
 Hoffman
 
 .
 

 At oral argument, Amazon contended that it should not be likened to a sales agent because it lists products and collects payment on behalf of various third-party vendors, whereas a sales agent typically represents a single seller or manufacturer. This is a distinction without a difference. Pennsylvania state courts have repeatedly found that large retailers who offer a range of different products are "sellers" within the meaning of § 402A.
 
 [53]
 
 Amazon is not exempted from strict products liability simply because its website offers a variety of products.
 
 [54]
 

 C
 

 Amazon's remaining arguments similarly fail to demonstrate that it is not subject to strict product liability in Pennsylvania.
 

 For example, Amazon asks that we look to dictionary definitions of the word "seller" for support. However, comment f to § 402A makes clear that the term "seller" is not limited by its dictionary definition, as it "applies to any manufacturer of such a product, to any wholesale or retail dealer or distributor, and to the operator of a restaurant."
 
 [55]
 
 Amazon contends that we should construe "seller" as a person who transfers a thing that she owns to another in exchange for something of value, usually money. This concept runs squarely against Pennsylvania case law that does not require an actor to possess or hold title to an item in order to be considered a "seller" for purposes of § 402A.
 
 [56]
 

 Amazon also relies heavily on non-controlling case law from jurisdictions other than Pennsylvania. However, in deciding whether Amazon is a "seller" within the meaning of § 402A, we must predict what the Pennsylvania Supreme Court would decide under Pennsylvania law interpreting the Second Restatement of Torts.
 
 [57]
 
 It is of little consequence whether Amazon is a "seller" for purposes of other states' statutes, as each of those statutory schemes is based on distinct language and policy considerations.
 
 [58]
 

 Therefore, having concluded that Amazon should be considered a "seller" under § 402A of the Second Restatement of Torts, we hold that under Pennsylvania law, Amazon is strictly liable for consumer injuries caused by defective goods purchased on Amazon.com.
 

 IV
 

 The second issue in this appeal is whether Oberdorf's claims, both for negligence and for strict liability, including failure to provide adequate warnings regarding the use of the dog collar, are barred by § 230 of the CDA.
 
 [59]
 
 Unlike the first issue, this is a question of federal law. We conclude that the CDA bars some, but not all, of Oberdorf's claims.
 

 The CDA states, in relevant part, that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."
 
 [60]
 
 This section, sometimes referred to as the CDA "safe harbor provision,"
 
 [61]
 
 "precludes courts from entertaining claims that would place a computer service provider in a publisher's role, and therefore bars lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions-such as deciding whether to publish, withdraw, postpone, or alter content."
 
 [62]
 
 The CDA is intended to allow interactive computer services companies "to perform some editing on user-generated content without thereby becoming liable for all defamatory or otherwise unlawful messages that they didn't edit or delete."
 
 [63]
 

 The CDA safe harbor provision was passed by Congress in the wake of a controversial New York state court decision allowing defamation claims to proceed against a website host.
 
 [64]
 

 The crux of Amazon's argument is that Oberdorf's negligence and strict liability
 claims are barred because she seeks to treat Amazon as the publisher or speaker of material provided by The Furry Gang, an information content provider.
 
 [65]
 
 Amazon contends Oberdorf's claims are essentially that Amazon should be held liable for letting The Furry Gang post the offer for the dog collar and for failing to police that offer once it was posted. Oberdorf, on the other hand, asserts that her claims do not pertain to Amazon's role in publishing third-party information but rather to its direct role in the actual sale and distribution of the defective product. That is true to a point but Oberdorf also contends that Amazon should have revised the content provided to include warnings to ensure the safe use of the dog collar. The question that we must answer is "Would such an addition to the content be part of the editorial function of the Amazon website?"
 

 Courts throughout the country have interpreted the CDA safe harbor provision broadly.
 
 [66]
 
 Turning first to our Court, in
 
 Green v. America Online
 
 ,
 
 [67]
 
 the plaintiff alleged that AOL had failed to properly police its chat rooms to prevent a third party from posting defamatory content that caused the plaintiff emotional distress.
 
 [68]
 
 We held that the CDA safe harbor provision barred the plaintiff's claims because he was "attempt[ing] to hold AOL liable for decisions relating to the monitoring, screening, and deletion of content from its network-actions quintessentially related to a publisher's role."
 
 [69]
 

 Other federal appellate courts have addressed related questions. For example, the First Circuit barred sex trafficking claims against a classified advertisement website because the allegations centered on the website's role in failing to regulate third-party content that led to the plaintiffs' injuries.
 
 [70]
 
 The Fifth Circuit barred negligence claims alleging that an online social network took insufficient precautions to prevent a fifteen-year-old teenager from lying about her age, thereby leading to her being contacted and sexually assaulted.
 
 [71]
 
 The Seventh Circuit barred housing discrimination claims against an online message board for permitting discriminatory posts.
 
 [72]
 

 These cases demonstrate that claims are precluded whenever "the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.' "
 
 [73]
 
 Nonetheless, courts have refused to extend the scope of the CDA safe harbor provision "to immunize a party's conduct outside the realm of the Internet just because it relates to the publishing of information on
 the Internet."
 
 [74]
 
 In
 
 Barnes v. Yahoo!, Inc.
 
 ,
 
 [75]
 
 for example, the Ninth Circuit barred the plaintiff's negligence claims against Yahoo for failing to remove posts by her ex-boyfriend containing nude photographs of her. However, the court held that the CDA safe harbor provision did not immunize Yahoo against the plaintiff's related promissory estoppel claim, which was based on Yahoo's promise to remove the injurious content rather than on any editorial function.
 
 [76]
 

 While we recognize that Amazon exercises online editorial functions, we do not agree that all of Oberdorf's claims seek to treat Amazon as the publisher or speaker of information provided by another information content provider. As previously discussed, Amazon is a "seller" of products on its website, even though the products are sourced and shipped by third-party vendors such as The Furry Gang.
 
 [77]
 
 Amazon's involvement in transactions extends beyond a mere editorial function; it plays a large role in the actual sales process. This includes receiving customer shipping information, processing customer payments, relaying funds and information to third-party vendors, and collecting the fees it charges for providing these services.
 

 Therefore, to the extent that Oberdorf's negligence and strict liability claims rely on Amazon's role as an actor in the sales process, they are not barred by the CDA. However, to the extent that Oberdorf is alleging that Amazon failed to provide or to edit adequate warnings regarding the use of the dog collar, we conclude that that activity falls within the publisher's editorial function. That is, Amazon failed to add necessary information to content of the website. For that reason, these failure to warn claims are barred by the CDA.
 

 Because the District Court did not parse Oberdorf's claims in order to distinguish between "failure to warn" claims and claims premised on other actions or failures in the sales or distribution processes, we will vacate its holding that Oberdorf's claims are barred by the CDA. To the extent that Oberdorf's claims rely on allegations relating to selling, inspecting, marketing, distributing, failing to test, or designing, they pertain to Amazon's direct role in the sales and distribution processes and are therefore not barred by the CDA safe harbor provision.
 
 [78]
 
 Those claims will be remanded to the District Court.
 

 V
 

 For the above reasons, we hold that (1) Amazon is a "seller" for purposes of § 402A of the Second Restatement of Torts and thus subject to the Pennsylvania strict products liability law, and (2) Oberdorf's claims against Amazon are not barred by § 230 of the CDA except as they rely upon a "failure to warn" theory of liability. We will therefore affirm the dismissal under the CDA of the failure to warn claims. We will vacate the remainder of the judgment of the District Court and remand this matter
 for further proceedings consistent with this opinion.
 

 Throughout this opinion, we use the more complete company name, "Amazon.com," to refer to Amazon's website, but use the shorter name, "Amazon" to refer to the company itself.
 

 David Streitfeld,
 
 Amazon Is Now Second to Cross $1 Trillion Line
 
 , N.Y. Times , Sept. 5, 2018, at B1.
 

 To remain consistent throughout this opinion, and to avoid using the term "seller," which has legal significance under Pennsylvania strict products liability law, we refer to the third parties who offer products on Amazon.com as "third-party vendors" or "vendors."
 

 JA195.
 

 The breach of warranty and misrepresentation claims and Michael Oberdorf's loss of consortium claim are not relevant to the present appeal.
 

 Fed. R. Civ. P. 56(a) ;
 
 see
 

 Mylan Inc. v. SmithKline Beecham Corp.
 
 ,
 
 723 F.3d 413
 
 , 418 (3d Cir. 2013). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law."
 
 Kaucher v. County of Bucks
 
 ,
 
 455 F.3d 418
 
 , 423 (3d Cir. 2006) (citing
 
 Anderson v. Liberty Lobby, Inc.
 
 ,
 
 477 U.S. 242
 
 , 248,
 
 106 S.Ct. 2505
 
 ,
 
 91 L.Ed.2d 202
 
 (1986) ).
 

 Hugh v. Butler Cty. Family YMCA
 
 ,
 
 418 F.3d 265
 
 , 266-67 (3d Cir. 2005).
 

 Erie R.R. Co. v. Tompkins
 
 ,
 
 304 U.S. 64
 
 , 78,
 
 58 S.Ct. 817
 
 ,
 
 82 L.Ed. 1188
 
 (1938).
 

 Webb v. Zern
 
 ,
 
 422 Pa. 424
 
 ,
 
 220 A.2d 853
 
 , 854 (1966).
 

 Restatement (Second) of Torts § 402A (Am. Law. Inst. 1965) (an actor can only be subject to strict liability for selling a defective product if he is a "seller ... engaged in the business of selling such a product").
 

 Our decision, guided by Pennsylvania law, is limited to the question of whether Amazon is a "seller" based on its role in effectuating sales of physical products offered by third-party vendors. We express no view, for example, on whether other companies providing online marketplaces are considered "sellers."
 

 522 Pa. 367
 
 ,
 
 562 A.2d 279
 
 (1989).
 

 Id.
 
 at 282-83.
 

 Id.
 
 at 281 (quoting Restatement (Second) of Torts § 402A cmt. f).
 

 Id.
 

 Id.
 
 at 282.
 

 Id.
 
 (citations omitted). Note that the four-factor test articulated in
 
 Musser
 
 was applied earlier in the context of determining whether a lessor should be considered a "seller" for purposes of § 402A.
 
 See
 

 Nath v. Nat'l Equip. Leasing Corp.
 
 ,
 
 497 Pa. 126
 
 ,
 
 439 A.2d 633
 
 , 635-36 (1981) ;
 
 Francioni v. Gibsonia Truck Corp.
 
 ,
 
 472 Pa. 362
 
 ,
 
 372 A.2d 736
 
 , 739 (1977). However,
 
 Musser
 
 represents the court's first use of the test outside of that context.
 

 Musser
 
 ,
 
 562 A.2d at 282
 
 .
 

 Id.
 

 See, e.g.
 
 ,
 
 Allstate N.J. Ins. Co. v. Amazon.com, Inc.
 
 , 17-cv-2738,
 
 2018 WL 3546197
 
 , at *2 (D.N.J. July 24, 2018) ("Neither Plaintiff nor [Amazon] is aware who manufactured the laptop battery ....");
 
 Fox v. Amazon.com
 
 , 16-cv-3013,
 
 2018 WL 2431628
 
 , at *6 (M.D. Tenn. May 30, 2018) ("[T]he manufacturer of the hoverboard at issue is unknown.")
 
 appeal filed
 
 No. 18-5661,
 
 2018 WL 2431628
 
 (6th Cir. June 25, 2018) ;
 
 Stiner v. Amazon
 
 , 15-cv-185837,
 
 2017 WL 9751163
 
 , at *7 (Ohio. Com. Pl. Sept. 20, 2017) (Dkt. No. 120-1) ("[The manufacturer] is a Chinese company and not subject to process and [the third-party vendor] is insolvent.").
 

 The dissent concludes that the first factor weighs in favor of Amazon because "[t]o assign liability for no reason other than the ability to pay damages is inconsistent with our jurisprudence."
 
 Cafazzo
 
 , 668 A.2d at 526. This contention overlooks the extensive record evidence that Amazon fails to vet third-party vendors for amenability to legal process. The first factor weighs in favor of strict liability not because The Furry Gang cannot be located and/or may be insolvent, but rather because Amazon enables third-party vendors such as The Furry Gang to structure and/or conceal themselves from liability altogether. As a result, Amazon remains "the only member of the marketing chain available to the injured plaintiff for redress."
 
 Musser
 
 ,
 
 562 A.2d at 281
 
 .
 

 Musser
 
 ,
 
 562 A.2d at 282
 
 .
 

 Id.
 

 JA168.
 

 JA150.
 

 Id.
 

 Id.
 

 The dissent contends that holding Amazon strictly liable for defective products will require them to "enter a fundamentally new business model" because "the company does not undertake to curate its selection of products, nor generally to police them for dangerousness." Dissent at 164-65. We do not believe that Pennsylvania law shields a company from strict liability simply because it adheres to a business model that fails to prioritize consumer safety. The dissent's reasoning would give an incentive to companies to design business models, like that of Amazon, that do nothing to protect consumers from defective products.
 

 Musser
 
 ,
 
 562 A.2d at 282
 
 .
 

 Id.
 

 497 Pa. 126
 
 ,
 
 439 A.2d 633
 
 (1981).
 

 Id.
 
 at 636.
 

 JA163.
 

 JA154.
 

 Musser
 
 ,
 
 562 A.2d at 282
 
 . The dissent contends that Amazon is no better-positioned than the consumer to encourage the safety of products sold in the Amazon Marketplace. However, the dissent openly acknowledges at least one aspect of Amazon's relationship with third-party sellers that demonstrates Amazon's powerful position relative to the consumer: Amazon "reserves the right to eject sellers." Dissent at 164. Imposing strict liability on Amazon will ensure that the company uses this relative position of power to eject sellers who have been determined to be selling defective goods.
 

 Musser
 
 ,
 
 562 A.2d at 283
 
 .
 

 Id.
 

 JA267.
 

 The dissent contends that the Pennsylvania Supreme Court's decision in
 
 Cafazzo
 
 upended the Commonwealth's well-established four-factor analysis, thereby rendering the
 
 Francioni
 
 factors secondary to a threshold question of whether a particular defendant is a supplier/seller of the product.
 
 Cafazzo v. Cent. Med. Health. Servs., Inc.
 
 ,
 
 542 Pa. 526
 
 ,
 
 668 A.2d 521
 
 , 525 (1995). However, even if we were to assume that
 
 Cafazzo
 
 created a threshold issue of whether Amazon is a seller, we believe, as detailed below, that under Pennsylvania law, Amazon is in fact a seller, and thus we must proceed to the
 
 Francioni
 
 factors.
 

 307 Pa.Super. 131
 
 ,
 
 452 A.2d 1349
 
 (1982).
 

 Id.
 
 at 1354-55.
 

 See
 

 Wisniewski v. Johns-Manville Corp.,
 

 759 F.2d 271
 
 , 273-74 (3d Cir. 1985). ("Although lower state court decisions are not controlling on an issue on which the highest court of the state has not spoken, federal courts must attribute significant weight to these decisions in the absence of any indication that the highest state court would rule otherwise.").
 

 452 A.2d at 1354-55
 
 .
 

 See
 

 id.
 

 at 1352 n.2 (citing an affidavit stating that, for all transactions involving the relevant packager, "title passed directly from [the manufacturer] to [the packager]," and that "[a]ny oil which [the packager] obtained from [the manufacturer] at the time in question was never owned by ... E.W. KAUFMANN COMPANY.").
 

 Id.
 

 at 1353 (citing Restatement (Second) of Torts § 402A, cmt. f).
 

 Id.
 
 at 1354.
 

 472 Pa. 362
 
 ,
 
 372 A.2d 736
 
 (1977).
 

 Id.
 
 at 738.
 

 497 Pa. 126
 
 ,
 
 439 A.2d 633
 
 (1981).
 

 Id.
 
 at 636.
 

 Id.
 

 JA111, JA114, JA154, JA166.
 

 See, e.g.
 
 ,
 
 Barton v. Lowe's Home Centers, Inc.
 

 124 A.3d 349
 
 , 352 (Pa. Super. Ct. 2015) (permitting claim against Lowes premised on it being a "seller" to proceed past demurrer stage);
 
 Burch v. Sears, Roebuck and Co.
 
 ,
 
 320 Pa.Super. 444
 
 ,
 
 467 A.2d 615
 
 , 621, 623 (1983) (holding that Sears is a "seller," and reaffirming that, "under our products liability law, all suppliers of a defective product in the chain of distribution, whether retailers, partmakers, assemblers, owners, sellers, lessors, or any other relevant category, are potentially liable to the ultimate user injured by the defect.");
 
 see also
 
 Restatement (Second) of Torts § 402A, cmt. f ("The rule stated in this Section applies to ... any manufacturer of such a product, to any wholesale or retail dealer or distributor, and to the operator of a restaurant. It is not necessary that the seller be engaged solely in the business of selling such products. Thus the rule applies to the owner of a motion picture theatre who sells popcorn or ice cream, either for consumption on the premises or in packages to be taken home.").
 

 The dissent characterizes
 
 Hoffman
 
 as a "narrow exception" to the general rule that a " 'seller' in Pennsylvania is almost always an actor who transfers ownership from itself to the customer." Even assuming
 
 arguendo
 
 that
 
 Hoffman
 
 represents an "exception," Amazon falls within said exception, which Pennsylvania courts have never labeled as "narrow." The dissent claims that the
 
 Hoffman
 
 exception applies only to "exclusive sales representatives or exclusive agents," with "exclusive agents" often considered sellers because the agent (1) "trafficks intimately in [the products],"
 
 Brumbaugh
 
 , 152 A.D. 2d at 72,
 
 547 N.Y.S.2d 699
 
 , and (2) is "bound by its exclusive sales representative contract to promote the sale of [the] products."
 
 Bittler
 
 ,
 
 148 Ill.Dec. 382
 
 , 560 N.E.2d at 982. The dissent concludes that because Amazon does not have any "exclusive" franchise in the sale of third-party products, it "clearly does not fit this description." There is one problem with the dissent's description of the so-called
 
 Hoffman
 
 exception: Nowhere in
 
 Hoffman
 
 does it state that the sales agent, E.W. Kaufmann Company, was an "exclusive" agent for the manufacturer. To the contrary, E.W. Kaufmann's ostensibly non-exclusive role as sales agent was nearly identical to that of Amazon: It received orders for the product on behalf of a third-party manufacturer and transmitted the orders to be fulfilled, never taking any right to possession or title.
 

 Restatement (Second) of Torts § 402A, cmt. f.
 

 See e.g.
 
 ,
 
 Hoffman
 
 ,
 
 452 A.2d at 1349
 
 .
 

 Berrier v. Simplicity Mfg., Inc.
 
 ,
 
 563 F.3d 38
 
 , 45-46 (3d Cir. 2009) ("In the absence of a controlling decision by the Pennsylvania Supreme Court, a federal court applying that state's substantive law must predict how Pennsylvania's highest court would decide this case.").
 

 The dissent also cites approvingly to out-of-jurisdiction case law determining that Amazon was not subject to strict liability as a "seller." In particular, the dissent highlights cases from the Fourth Circuit, Sixth Circuit, Southern District of New York, and Northern District of Illinois, none of which should shape our analysis here.
 
 See
 

 Erie Ins. Co. v. Amazon.com
 
 ,
 
 925 F.3d 135
 
 , (4th Cir. 2019) ;
 
 Fox v. Amazon
 
 ,
 
 930 F.3d 415
 
 (6th Cir. 2019) ;
 
 Eberhart v. Amazon, Inc.
 
 ,
 
 325 F. Supp. 3d 393
 
 (S.D.N.Y. 2018) ;
 
 Garber v. Amazon.com, Inc.
 
 , No.
 
 17 C 673
 
 ,
 
 380 F.Supp.3d 766
 
 ,
 
 2019 WL 1437877
 
 (N.D. Ill. Mar. 31, 2019). The Fourth Circuit case made clear that its holding turned in large part on a provision of the Maryland Uniform Commercial Code, which, of course, has no effect on Pennsylvania law.
 
 See
 

 Erie Ins. Co.
 
 ,
 
 925 F.3d at
 
 141 (citing § 2-103(1)(d) of the Maryland Code of Commercial Law as a basis for its holding because it defines a "sale" as "the passing of title from the seller to the buyer for a price"). Moreover, as Judge Motz noted in her concurrence in that case, as a federal court sitting in diversity, "[g]iven the policy-intensive nature of this inquiry, the lack of on-point Maryland precedent, and Amazon's novel business model," one could not "confidently predict that Maryland courts would treat Amazon as a seller under state law."
 

 Id.
 

 at 145
 
 . The Sixth Circuit case was explicitly based on a Tennessee statute that applied a different test than that of § 402A of the Second Restatement, namely, whether an "individual [was] regularly engaged in exercising sufficient control over a product in connection with its sale."
 
 Fox
 
 ,
 
 930 F.3d at 425
 
 . Under Pennsylvania law, on the other hand, we apply the
 
 Francioni
 
 factors, none of which parallel the apparently single-factor Tennessee test for "sufficient control."
 

 Id.
 

 In the New York case, the federal district court noted that under New York law, a distributor cannot be held strictly liable for product defects unless it "at some point, own[ed] the defective product."
 
 Eberhart
 
 ,
 
 325 F. Supp. 3d at 398
 
 . And in the Illinois case, the district court noted that prior state cases appeared to require an "exclusivity" arrangement where an alleged seller was not involved in transferring title.
 
 Garber
 
 ,
 
 380 F.Supp.3d at 777
 
 ,
 
 2019 WL 1437877
 
 , at *7 ("The [plaintiffs] have not presented any evidence that Amazon purported to be the exclusive seller of Shenzhen hoverboards."). As noted above, in Pennsylvania, a party involved in the sales process need not own the defective product or have an exclusivity arrangement with the manufacturer to be strictly liable for product defects.
 
 See
 
 ,
 
 e.g.
 
 ,
 
 Hoffman
 
 ,
 
 452 A.2d 1349
 
 . Therefore, we do not believe these non-precedential, out-of-circuit cases should guide our reasoning. Our task is strictly limited to determining what the Pennsylvania Supreme Court would do pursuant to Pennsylvania law.
 

 See
 

 47 U.S.C. § 230
 
 .
 

 47 U.S.C. § 230
 
 (c)(1).
 

 See, e.g.
 
 ,
 
 Zango, Inc. v. Kaspersky Lab, Inc.
 
 ,
 
 568 F.3d 1169
 
 , 1170 (9th Cir. 2009).
 

 Green v. America Online
 
 ,
 
 318 F.3d 465
 
 , 471 (3d Cir. 2003) (citations omitted).
 

 Fair Housing Council of San Fernando Valley v. Roommates.com, LLC
 
 ,
 
 521 F.3d 1157
 
 , 1163 (9
 
 th
 
 Cir. 2008) (en banc).
 

 See
 

 Stratton Oakmont, Inc. v. Prodigy Servs. Co.
 
 , No. 31063/94,
 
 1995 WL 323710
 
 (N.Y. Sup. Ct. May 24, 1995).
 

 See
 

 47 U.S.C. § 230
 
 (c)(1). "The term 'information content provider' means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."
 

 Id.
 

 § 230(f)(3).
 

 See
 

 Jane Doe No. 1 v. Backpage.com, LLC
 
 ,
 
 817 F.3d 12
 
 , 19 (1st Cir. 2016) (collecting federal appellate cases).
 

 318 F.3d 465
 
 (3d Cir. 2003).
 

 Id.
 

 at 469
 
 .
 

 Id
 
 . at 471.
 

 Jane Doe No. 1 v. Backpage.com, LLC
 
 ,
 
 817 F.3d 12
 
 , 22 (1st Cir. 2016).
 

 Doe v. MySpace, Inc.
 
 ,
 
 528 F.3d 413
 
 , 420 (5th Cir. 2008).
 

 Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.
 
 ,
 
 519 F.3d 666
 
 , 672 (7th Cir. 2008),
 
 as amended
 
 (May 2, 2008).
 

 Barnes v. Yahoo!, Inc.
 
 ,
 
 570 F.3d 1096
 
 , 1102 (9th Cir. 2009),
 
 as amended
 
 (Sept. 28, 2009).
 

 Fed. Trade Comm'n v. Accusearch Inc.
 
 ,
 
 570 F.3d 1187
 
 , 1206 (10th Cir. 2009) (Tymkovich, J., concurring).
 

 570 F.3d 1096
 
 (9th Cir. 2009).
 

 Id.
 

 at 1107-09
 
 .
 

 See supra
 
 Part III.
 

 The Fourth Circuit has similarly held that the CDA does not insulate Amazon against claims based on its participation in the sale of a defective product.
 
 See
 

 Erie Ins. Co.
 
 ,
 
 925 F.3d at 140
 
 ("While the Communications Decency Act protects interactive computer service providers from liability
 
 as a publisher of speech
 
 , it does not protect them from liability as the seller of a defective product.").